United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

TAMI HANNAN, et al.,

              Plaintiffs,

    v.

BOSTON SCIENTIFIC CORPORATION,

              Defendant.

Case No.  19-cv-08453-PJH

**ORDER GRANTING IN PART AND
DENYING IN PART MOTION TO
DISMISS**

Re: Dkt. No. 20

      Before the court is defendant Boston Scientific Corporation's ("Boston Scientific" or "defendant") motion to dismiss.  The matter is fully briefed and suitable for decision without oral argument.  Having read the parties' papers and carefully considered their arguments and the relevant legal authority, and good cause appearing, the court hereby rules as follows.

**BACKGROUND**

      On December 30, 2019, plaintiffs Tami Hannan and Daniel Hannan ("plaintiffs")[1] filed a complaint alleging that one of defendant Boston Scientific's pelvic mesh products was implanted in Tami Hannan and has since caused her significant pain and other harm.  Dkt. 1.  On February 25, 2020, plaintiffs filed a First Amended Complaint ("FAC") alleging seven causes of action:  (1) product liability—defective manufacture and design; (2) product liability—failure to warn; (3) negligence; (4) breach of express warranty; (5) negligent misrepresentation; (6) violation of California Business & Professions Code

_____

[1] Because the majority of the facts and circumstances of this case revolve around plaintiff Tami Hannan, references to a singular "plaintiff" refer to her unless noted otherwise.

United States District Court
Northern District of California

§ 17200 <u>et seq.</u>; and (7) loss of consortium.  Dkt. 19.

This case is related to a multi-district litigation ("MDL") that consolidated cases involving defendant's transvaginal pelvic mesh products for pretrial purposes in the District Court for the Southern District of West Virginia.  <u>See In Re: Bos. Sci. Corp., Pelvic Repair Sys. Prods. Liab. Litig.</u>, No. MDL 2326 (S.D. W. Va. Jan. 29, 2012).[2]  Since its inception in 2012, tens of thousands of cases have been transferred to the pelvic mesh products MDL.  The presiding MDL judge has worked up "waves" of individual cases whereby the district court would handle all pretrial discovery and motions practice before remanding each case to the appropriate district for trial.  <u>See, e.g.</u>, <u>In re Bos. Sci. Corp., Pelvic Repair Sys. Prods. Liab. Litig.</u>, No. 2:12-CV-05950, 2015 WL 1405498, at *1 (S.D.W. Va. Mar. 26, 2015) (describing MDL process).  In late June 2018, the Judicial Panel on Multidistrict Litigation and the presiding judge issued orders such that new plaintiffs could no longer file claims directly in the MDL.  <u>See</u> Pretrial Order No. 188, <u>In Re: Bos. Sci. Corp., Pelvic Repair Sys. Prods. Liab. Litig.</u>, No. MDL 2326 (S.D. W. Va. June 21, 2018).

Plaintiffs in this case were originally part of the fourth wave of cases in MDL 2326, having filed their claims on December 29, 2015.  <u>See</u> <u>Hannan v. Bos. Sci. Corp.</u>, No. 15-cv-16560 (S.D. W. Va.).  While the parties engaged in discovery, they simultaneously undertook efforts to resolve plaintiffs' claims, which resulted in the presiding judge transferring the case to the court's "inactive docket."  The court later determined that thousands of cases ended up on the inactive docket where they resided for much longer than the court originally intended and ordered the inactive docket closed.  <u>See</u> Pretrial Order No. 195, <u>In Re: Bos. Sci. Corp., Pelvic Repair Sys. Prods. Liability Litig.</u>, No. MDL 2326 (S.D. W. Va. Oct. 24, 2018).  In an effort to continue settlement negotiations, the parties agreed to dismiss plaintiffs' claims without prejudice, which was granted on January 14, 2019.  Unable to resolve the claims, plaintiffs filed the present action as they

---

[2] Pretrial orders related to this MDL are located at:
https://www.wvsd.uscourts.gov/MDL/boston/orders.html.

United States District Court
Northern District of California

were no longer able to file directly in the MDL.

Defendant Boston Scientific manufactures a series of pelvic mesh products that are used to treat pelvic organ prolapse and stress urinary incontinence.  FAC ¶¶ 9–10.  Pelvic organ prolapse occurs when a pelvic organ drops from its normal position and pushes against the wall of the vagina.  Id. ¶ 11.  Stress urinary incontinence is a type of incontinence characterized by urine leakage during moments of physical stress.  Id. ¶ 12.  Defendant's pelvic mesh products contain surgical mesh that is generally used to repair weakened or damaged tissue and is permanently implanted to reinforce weakened vaginal walls which then helps repair pelvic organ prolapse or supports the urethra to treat urinary incontinence.  Id. ¶ 13.

Despite claims that surgical mesh is inert, scientific evidence shows that when surgical mesh is implanted, the polypropylene mesh promotes severe foreign body reaction and chronic inflammatory response.  Id. ¶ 14.  This immune response promotes degradation of the mesh and pelvic tissue, causing chronic inflammation and pain.  Id.  The Food and Drug Administration ("FDA") cleared the first pelvic mesh products to treat stress urinary incontinence in 1996 but did not require a formal review for safety or efficacy because the products were deemed substantially equivalent to prior devices marketed before May 1976.  Id. ¶ 17.  However, on July 13, 2011, the FDA issued a safety communication in which it stated that "serious complications associated with surgical mesh for transvaginal repair of [pelvic organ prolapse] are not rare."  Id. ¶ 18.  In addition to other warnings, the FDA stated "it is not clear that transvaginal [pelvic organ prolapse] repair with mesh is more effective than traditional non-mesh repair in all patients with [pelvic organ prolapse] and it may expose patients to greater risks."  Id. ¶ 20.  Simultaneous with the safety communication, the FDA released a white paper in which it noted published peer-reviewed literature generally concluding that patients with surgical mesh experienced complications that were not experienced by patients who underwent traditional surgery without mesh.  Id. ¶ 21.

The FDA's July 2011 safety communication did not discuss stress urinary

United States District Court
Northern District of California

1  incontinence and in September 2011, the FDA issued a communication acknowledging

2  the need for more data while also noting that information related to stress urinary

3  incompetence indicated that serious complications could occur.  Id. ¶ 28.  Plaintiffs allege

4  that defendant has not adequately studied the extent of the risks associated with the

5  stress urinary incontinence products.  Id. ¶ 29.  Plaintiffs allege that defendant knew or

6  should have known its pelvic mesh products unreasonably exposed patients to the risk of

7  serious harm while conferring no benefit over available feasible alternatives.  Id. ¶ 30.

8       Plaintiffs allege that the pelvic mesh products continue to be marketed to the

9  medical community and patients as safe and effective, but defendant has omitted and

10  downplayed the risks and dangers of the products.  Id. ¶¶ 34–35.  While some problems

11  were made known to physicians, the magnitude and frequency of these problems were

12  not disclosed and instead hidden from physicians.  Id. ¶ 35.  Plaintiffs allege the pelvic

13  mesh products suffer from a variety of defects including, for example, the use of

14  polypropylene causes adverse tissue reactions, the use of raw materials were not

15  intended for use as human implant, and biomechanical issues with the design of the

16  products result in a nonanatomic condition leading to contraction or shrinkage of the

17  mesh inside the body.  Id. ¶ 37.  They further allege that defendant failed to warn plaintiff

18  or her physicians of facts concerning, for example, the products' "propensities to contract,

19  retract and/or shrink inside the body" or the products' "propensities for degradation,

20  fragmentation aid/or [sic] migration."  Id. ¶ 38.

21       Specific to this case, plaintiff Tami Hannan underwent transvaginal surgery on or

22  about December 3, 2012 during which Boston Scientific's Obtryx Transobturator Mid-

23  Urethral Sling System (the "Obtryx Sling") was implanted by plaintiff's physicians.  Id.

24  ¶ 67.  As a result of the implant, plaintiff has suffered significant pain, unnecessary

25  expense, embarrassment, disfigurement, and harm as a result of the Obtryx Sling.  Id.

26  ¶ 68.

27  / / /

28  / / /

**DISCUSSION**

**A.    Legal Standard**

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests for the legal sufficiency of the claims alleged in the complaint.  Ileto v. Glock Inc., 349 F.3d 1191, 1199–1200 (9th Cir. 2003).  Under Federal Rule of Civil Procedure 8, which requires that a complaint include a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), a complaint may be dismissed under Rule 12(b)(6) if the plaintiff fails to state a cognizable legal theory, or has not alleged sufficient facts to support a cognizable legal theory.  Somers v. Apple, Inc., 729 F.3d 953, 959 (9th Cir. 2013).

While the court is to accept as true all the factual allegations in the complaint, legally conclusory statements, not supported by actual factual allegations, need not be accepted.  Ashcroft v. Iqbal, 556 U.S. 662, 678–79 (2009).  The complaint must proffer sufficient facts to state a claim for relief that is plausible on its face.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 558–59 (2007).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678.  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'"  Id. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).  Where dismissal is warranted, it is generally without prejudice, unless it is clear the complaint cannot be saved by any amendment.  In re Daou Sys., Inc., 411 F.3d 1006, 1013 (9th Cir. 2005).

Review is generally limited to the contents of the complaint, although the court can also consider documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the plaintiff's pleading."  Knievel v. ESPN, 393 F.3d 1068, 1076 (9th Cir. 2005) (quoting In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 986 (9th Cir. 1999), superseded by statute on

other grounds as stated in In re Quality Sys., Inc. Sec. Litig., 865 F.3d 1130 (9th Cir. 2017)); see also Sanders v. Brown, 504 F.3d 903, 910 (9th Cir. 2007) ("[A] court can consider a document on which the complaint relies if the document is central to the plaintiff's claim, and no party questions the authenticity of the document." (citation omitted)). The court may also consider matters that are properly the subject of judicial notice (Lee v. City of Los Angeles, 250 F.3d 668, 688–89 (9th Cir. 2001)), and exhibits attached to the complaint (Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc., 896 F.2d 1542, 1555 n.19 (9th Cir. 1989)).

For plaintiffs' claims that sound in fraud, the complaint must also meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b). See Kearns v. Ford Motor Co., 567 F.3d 1120, 1125 (9th Cir. 2009). Rule 9(b) requires a party alleging fraud or mistake to state with particularity the circumstances constituting fraud or mistake. "To satisfy Rule 9(b)'s particularity requirement, the complaint must include an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." Depot, Inc. v. Caring for Montanans, Inc., 915 F.3d 643, 668 (9th Cir. 2019) (internal quotation marks omitted). In other words, "[a]verments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged." Kearns, 567 F.3d at 1124. Plaintiffs must also offer "an explanation as to why the statement or omission complained of was false or misleading." In re GlenFed, Inc. Sec. Litig., 42 F.3d 1541, 1548 (9th Cir. 1994) (en banc), superseded by statute on other grounds as stated in SEC v. Todd, 642 F.3d 1207, 1216 (9th Cir. 2011).

**B.    Analysis**

    **1.    First Claim:  Product Liability—Defective Manufacture and Design**

Plaintiffs' first claim alleges product liability under two different theories: a manufacturing defect and a design defect. With regard to the manufacturing defect, they allege that one or more defects in the pelvic mesh products are the result of improper or incorrect processes that result in the products deviating from their intended design. FAC

¶ 72.  The defects caused by improper or incorrect manufacturing rendered the products unreasonably dangerous, deficient, and defective to plaintiff.  Id. ¶ 73.  With respect to their design defect allegations, in a footnote, plaintiffs state that the design defect is limited to defendant's "failure to provide adequate warnings regarding the Obtryx device." Id. at 19 n.1.

Defendant moves to dismiss the first claim on two grounds.  First, California law rejects strict liability design defect claims relating to medical devices prescribed by a physician.  Mtn. at 3.  Defendant says that this holding applies to plaintiffs' strict liability design defect claims even though plaintiffs' assert the design defect claim sounds in a failure to warn theory.  Id. at 3.  Second, plaintiffs have not identified a manufacturing defect in the specific device that was surgically implanted in Tami Hannan.  Id. at 4.  In response, plaintiffs assert that while they cannot demonstrate that the product differs from others in its product line, they can demonstrate that no reasonable manufacturer would intend for its product not to be the cure it advertised or be made from raw materials not suitable for implantation in the human body.  Opp. at 10.

Generally, California law extends the strict liability doctrine to three types of product defect.  Barker v. Lull Engineering Co., 20 Cal. 3d 413, 428 (1978).  "First, there may be a flaw in the manufacturing process, resulting in a product that differs from the manufacturer's intended result."  Brown v. Superior Court, 44 Cal. 3d 1049, 1057 (1988). "Second, there are products which are 'perfectly' manufactured but are unsafe because of the absence of a safety device, i.e., a defect in design."  Id.  "The third type of defect identified in Barker is a product that is dangerous because it lacks adequate warnings or instructions," i.e., a failure to warn.  Id.

In Brown v. Superior Court, the California Supreme Court addressed whether a plaintiff could recover against a pharmaceutical drug manufacturer based on a strict liability design defect theory.  In reviewing pertinent public policies, the court distinguished between prescription drugs and other types of products; in non-prescription drug cases, "the product is used to make work easier or to provide pleasure," while

prescription drugs "may be necessary to alleviate pain and suffering or to sustain life." Id. at 1063.  The court noted a public policy favoring "the development and marketing of beneficial new drugs, even though some risks, perhaps serious ones, might accompany their introduction, because drugs can save lives and reduce pain and suffering." Id. Relying on that and similar public policy considerations, the court held "that a manufacturer is not strictly liable for injuries caused by a prescription drug so long as the drug was properly prepared and accompanied by warnings of its dangerous propensities that were either known or reasonably scientifically knowable at the time of distribution." Id. at 1069.  However, the court did not exempt drug manufacturers from strict liability for manufacturing defects or from liability for negligence or failure to warn of reasonably knowable side effects.  Hufft v. Horowitz, 4 Cal. App. 4th 8, 17 (Ct. App. 1992) (citing Brown, 44 Cal. 3d at 1069 n.12).  In Hufft, the California Court of Appeal extended Brown's holding to manufacturers of implanted medical devices.  Id. at 19–20; see also Garrett v. Howmedica Osteonics Corp., 214 Cal. App. 4th 173, 184–85 (Ct. App. 2013) (applying Brown to non-prescription implanted medical devices).

Here, plaintiffs first claim alleges both manufacturing and design defect theories of liability.  Plaintiffs' strict liability design defect claim presents immediate issues.  Brown and its progeny clearly exempt medical device manufacturers from strict liability for design defects.  Garrett, 214 Cal. App. 4th at 183 (citing Brown, 44 Cal. 3d at 1065 n.10, 1066–69).  Yet, in a footnote, plaintiffs state that their design defect claim is "limited to [d]efendant's failure to provide adequate warnings regarding the Obtryx device."  FAC at 19 n.1.  Any failure to warn claim is duplicative of plaintiffs' second and third claims for strict liability and negligent failure to warn.  Nor have plaintiffs cited a case for the proposition that a design defect claim that is limited to failure to provide adequate warnings survives Brown.  No matter which interpretation plaintiffs intended, they cannot state a claim for strict liability of a design defect.

Turning to plaintiffs' strict liability manufacturing defect claim, they allege that "[t]he defects caused by improper or incorrect manufacturing rendered the [pelvic mesh

1   p]roducts unreasonably dangerous, deficient, and defective to consumers and to

2   Plaintiff." Id. ¶ 73.  A manufacturing defect claim is predicated on a theory that "a suitable

3   design is in place, but that the manufacturing process has in some way deviated from

4   that design." In re Coordinated Latex Glove Litig., 99 Cal. App. 4th 594, 613 (Ct. App.

5   2002).  "A product has a manufacturing defect if it differs from the manufacturer's

6   intended result or from other ostensibly identical units of the same product line." Garrett,

7   214 Cal. App. 4th at 190 (citing Barker, 20 Cal. 3d at 429).

8        Plaintiffs have not identified a manufacturing defect in the specific Obtryx Sling

9   product that plaintiff's physicians implanted in her.  Indeed, their opposition brief admits

10  they cannot do this.  Opp. at 10.  Instead, they argue that the Obtryx Sling was made

11  from materials that defendant knew was not suitable for human implants.  Judge Ishii in

12  the Eastern District of California recently issued two opinions dealing with similar

13  manufacturing defect claims pertaining to Boston Scientific's Obtryx Sling. Zetz v. Bos.

14  Sci. Corp., 398 F. Supp. 3d 700, 709 (E.D. Cal. 2019); Garcia v. Bos. Sci. Corp., No. 19-

15  cv-0381 AWI SAB, 2019 WL 2598716, at *2 (E.D. Cal. June 25, 2019).  In both cases,

16  the plaintiffs alleged that the Obtryx Sling failed to perform as Boston Scientific intended

17  and therefore gave rise to the inference that the product was improperly manufactured.

18  In both cases, the court determined that each complaint's allegations were "insufficient to

19  support a manufacturing defect claim because the allegations failed to explain how much

20  the alleged deviation related to the manufacture." Zetz, 398 F. Supp. 3d at 709; Garcia,

21  2019 WL 2598716, at *3.  The reasoning in those cases is directly applicable here.

22       Plaintiffs' argument suffers from a further complication.  The FAC identifies defects

23  applicable to all Boston Scientific pelvic mesh products.  For example, plaintiffs allege

24  "[o]ne or more of the defects . . . are a result of improper or incorrect manufacturing

25  processes that result in the Products . . . deviating from its intended design.  The

26  incorrect manufacturing processes that plaintiffs identify include but are not limited to the

27  use of raw materials not intended for use in human medical implants and heat

28  sealing/treatment of the edges of the Product.  FAC ¶ 72.  Despite casting this allegation

United States District Court
Northern District of California

9

as a manufacturing defect, the allegations are indicative of a flaw in the design of an entire line of products rather than one product differing from other ostensibly identical units.  See Jager v. Davol, Inc., No. EDCV 16-1424 JB (KKx), 2017 WL 696081, at *5 (C.D. Cal. Feb. 9, 2017) (noting that a purported manufacturing defect in the product "only suggests that the design of [a component of the product] was the problem . . . but does not explain what aspect of manufacture made the particular product defective").  In other words, plaintiffs' manufacturing defect claim essentially advances a design defect theory, i.e. "the benefits of the design do not outweigh the risk of danger inherent in the design."  Garrett, 214 Cal. App. 4th at 182.  Brown precludes such a theory when it is brought as a strict liability claim.

In sum, plaintiffs' design defect claim is either precluded by Brown or entirely duplicative of their second cause of action.  Their manufacturing defect claim does not identify the defect in the particular Obtryx Sling implanted in plaintiff and otherwise seeks to advance a design defect theory.  None of those allegations state a claim.

For the foregoing reasons, defendant's motion to dismiss plaintiffs' first claim for manufacturing and design defect is GRANTED.

### 2.    Second Claim:  Product Liability—Failure to Warn

Plaintiffs' second claim alleges defendant is strictly liable for a failure to warn plaintiff or her implanting physicians that the product was defective.  FAC ¶ 82.  Plaintiffs allege that Boston Scientific failed to provide warnings or instructions based on knowledge of certain risks at the time the Obtryx Sling left Boston Scientific's control.  Id. ¶¶ 38, 85.  They also allege that defendant received notices of numerous bodily injuries resulting from its pelvic mesh products and failed to provide post-marketing or post-sale warnings or instructions to plaintiff or her implanting physicians.  Id. ¶ 86.

Under California law, a product may be defective because of the absence of an adequate warning of the dangers inherent in its use.  Brown, 44 Cal. 3d at 1057.  A failure-to-warn claim may be brought under either a theory of negligence or a theory of strict liability.  In Anderson v. Owens–Corning Fiberglas Corp., 53 Cal. 3d 987, 1003

10

(1991), the California Supreme Court held that manufacturers are strictly liable for injuries

caused by their failure to give warning of dangers that were known to the scientific

community at the time they manufactured and distributed the product.  Five years later, in

Carlin v. Superior Court, 13 Cal. 4th 1104, 1117 (1996), the court held that Anderson's

reasoning applies to prescription drug cases.  The Carlin court quoted the following

excerpt from Anderson at length to explain the difference between strict liability and

negligence in failure to warn cases:

> [F]ailure to warn in strict liability differs markedly from failure to warn in the negligence context.  Negligence law in a failure-to-warn case requires a plaintiff to prove that a manufacturer or distributor did not warn of a particular risk for reasons which fell below the acceptable standard of care, i.e., what a reasonably prudent manufacturer would have known and warned about.
>
> Strict liability is not concerned with the standard of due care or the reasonableness of a manufacturer's conduct.  The rules of strict liability require a plaintiff to prove only that the defendant did not adequately warn of a particular risk that was known or knowable in light of the generally recognized and prevailing best scientific and medical knowledge available at the time of manufacture and distribution.  Thus, in strict liability, as opposed to negligence, the reasonableness of the defendant's failure to warn is immaterial . . . ."

Id. at 1112 (first alteration in original) (quoting Anderson, 53 Cal. 3d at 1003); see also

Wright v. Stang Mfg. Co., 54 Cal. App. 4th 1218, 1230–31 (Ct. App. 1997) ("[T]he more

severe the consequences from unprotected exposure, the greater the need to warn of

significant health risks." (quoting Schwoerer v. Union Oil Co., 14 Cal. App. 4th 103, 112

(Ct. App. 1993))).

While Carlin permits a strict liability failure to warn theory of liability, it also held

that a failure to warn in the prescription drug context must be read with California's

"learned intermediary" doctrine, which states that in the case of prescription drugs, the

duty to warn "runs to the physician, not to the patient."  Carlin, 13 Cal. 4th at 1116

(citations omitted); see also Bigler-Engler v. Breg, Inc., 7 Cal. App. 5th 276, 319 (Ct. App.

2017) (noting that the learned intermediary doctrine applies to implanted medical

devices).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Under the learned intermediary doctrine, "if adequate warning of potential dangers

2  of a drug has been given to doctors, there is no duty by the drug manufacturer to insure

3  that the warning reaches the doctor's patient for whom the drug is prescribed."  Stevens

4  v. Parke, Davis & Co., 9 Cal. 3d 51, 65 (1973) (internal quotations and citation omitted);

5  see Brown, 44 Cal. 3d at 1062 n.9 ("[A] manufacturer fulfills its duty to warn if it provides

6  adequate warning to the physician.").

7    Here, defendant argues that the learned intermediary doctrine bars plaintiffs'

8  claims to the extent they allege the duty runs from Boston Scientific as manufacturer to

9  anyone other than Tami Hannan's physician.  Mtn. at 6.  Defendant further contends that

10  plaintiffs' remaining claims do not plausibly allege that defendant failed to warn plaintiff's

11  physician with any warning that would have changed her physician's decision to use the

12  product.  Id.  Plaintiffs agree that the learned intermediary doctrine only runs from the

13  manufacturer to plaintiff's physicians.  Opp. at 11.  They contend that the FAC alleges

14  several ways in which defendant did not warn or provided inadequate warnings to

15  Hannan's implanting physicians.  Id.

16    As both parties recognize, the learned intermediary doctrine means that Boston

17  Scientific fulfilled its duty to warn if it provided adequate warnings to Tami Hannan's

18  physicians.  Nonetheless, plaintiffs have pled sufficient allegations that defendant failed

19  to provide such adequate warnings to plaintiff's physicians.  For example, plaintiffs allege

20  that defendant "failed to properly and adequately warn and instruct the Plaintiff and/or her

21  health care providers as to the risks and benefits of Boston Scientific's Pelvic Mesh

22  Products."  FAC ¶ 83 (emphasis added).  As a second example, Boston Scientific failed

23  to provide adequate warning or instruction via its "Directions for Use of the Obtryx,

24  Physician training, and marketing to Plaintiff or her implanting physicians and health care

25  providers."  Id. ¶ 85 (emphasis added).  The FAC contains other allegations pertaining to

26  a failure to warn plaintiff's physicians.  Id. ¶¶ 38, 82, 84

27    The court in Zetz found allegations similar to those in plaintiffs' FAC plausibly

28  stated a claim.  For example, the plaintiffs in Zetz alleged that Boston Scientific

"knowingly provided incomplete and insufficient training and information <u>to physicians</u> regarding the use of the Obtyrx and the aftercare of patients of patients implanted with the Obtyrx." 398 F. Supp. 3d at 707. As another example, the <u>Zetz</u> plaintiffs alleged "[t]he risk of serious injuries was known or should have been known to Defendants, but in spite of these risks, Defendants deliberately concealed these risks and, instead, represented that the product was safe and effective and continued to market the Obtryx <u>to physicians</u> and patients, including Plaintiffs, without adequate warnings." <u>Id.</u> These allegations are similar to the allegations here. Thus, defendant is on notice that it failed to warn plaintiff's physicians concerning the Obtryx Sling.

For the foregoing reasons, defendant's motion to dismiss plaintiffs' second claim for product liability—failure to warn is DENIED.

### 3.   Third Claim:  Negligence

Plaintiffs' third claim for negligence alleges that defendant had a duty to use reasonable care in "designing, researching, manufacturing, marketing, labeling, packaging, supplying, distributing and selling the Obtryx Product." FAC ¶ 92. They also allege that defendant had a duty to warn or instruct plaintiff or her health care providers. <u>Id.</u> ¶ 95. Thus, plaintiffs are asserting design defect, manufacturing defect, and failure to warn theories, all sounding in negligence.

As a general rule, to prevail on a negligence claim, "plaintiffs must show that [Boston Scientific] owed them a legal duty, that it breached that duty, and that the breach was a proximate or legal cause of their injuries." <u>Merrill v. Navegar, Inc.</u>, 26 Cal. 4th 465, 477 (2001) (citing <u>Sharon P. v. Arman, Ltd.</u>, 21 Cal. 4th 1181, 1188 (1999), <u>disapproved on other grounds by</u> <u>Reid v. Google, Inc.</u>, 50 Cal. 4th 512 (2010)). To recover under a negligence theory, a plaintiff must prove both that a defect caused the injury and "that the defect in the product was due to negligence of the defendant." <u>Id.</u> at 479 (quoting Prosser, <u>Strict Liability to the Consumer</u>, 18 Hastings L.J. 9, 50–51 (1966); and citing <u>Jiminez v. Sears, Roebuck & Co.</u>, 4 Cal. 3d 379, 383 (1971)).

/ / /

### i.   Failure to Warn

Defendant contends that the learned intermediary doctrine also applies to plaintiffs' negligent failure to warn claim.  Mtn. at 6.  Defendant further argues that plaintiffs' failure to warn claims should be dismissed for lack of plausible allegations that Boston Scientific failed to warn plaintiff's physicians.  Id.  Plaintiffs respond that they have listed twenty specific defects in the warnings provided to physicians, including Tami Hannan's physicians.  Opp. at 13.

In its reply brief, defendant cites (and attaches)[3] an opinion by the Central District of California in Fischer v. Boston Scientific Corp., No. SACV 19-02106 JVS (DFM) (C.D. Cal. Mar. 25, 2020).  Fischer dealt with a different Boston Scientific pelvic mesh product and a similar negligent failure to warn claim.  Slip. op. at 1–2.  On a Rule 12(b)(6) motion, the district court in Fischer dismissed a failure to warn claim because the plaintiff had not identified "who her implanting physician was, what warning the physician received, or how the warnings that were disclosed to the physician were inadequate."  Id. at 4.

The question here is whether plaintiffs have alleged sufficient factual content to allows the court to draw the reasonable inference that defendant is liable for the misconduct alleged.  Iqbal, 556 U.S. at 678.  Plaintiffs have done so in this case and therefore their allegations are distinguishable from Fischer.  They identify Tami Hannan's physicians by name (FAC ¶ 67) and allege that defendant "fail[ed] to adequately warn or instruct the [p]laintiff and/or her health care providers, including her implanting physicians" (id. ¶ 38).  They then identify the facts or subjects that defendant failed to warn or instruct her implanting physicians, which states how the warnings were inadequate.  Id. ¶ 38.  That is, the warnings disclosed to plaintiff's physicians were

---

[3] Generally, "when a court takes judicial notice of another court's opinion, it may do so 'not for the truth of the facts recited therein, but of the existence of the opinion, which is not subject to reasonable dispute over its authenticity.'" Lee, 250 F.3d at 690 (quoting S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp., Ltd., 181 F.3d 410, 426–27 (3d Cir. 1999)).  Therefore, the court does not take notice of the truth of the facts recited in the opinion, but because the opinion has not been published in a commercial reporter, in this instance it is appropriate to notice the existence of the attached opinion.

United States District Court
Northern District of California

1   inherently inadequate because they failed to include warnings about various harmful

2   subjects.  Other district courts evaluating negligent failure to warn claims involving pelvic

3   mesh products have found similar allegations sufficient.  See Zetz, 398 F. Supp. 3d at

4   707; Hix v. Bos. Sci. Corp., No. CV-19-00422-PHX-DJH, 2019 WL 6003456, at *4–5 (D.

5   Ariz. Nov. 14, 2019); Garcia, 2019 WL 2598716, at *3.  Therefore, plaintiffs have

6   sufficiently alleged that Boston Scientific had a duty to warn plaintiff's physicians and

7   failed to do so.

8         As to the final element of a negligence claim, plaintiffs allege that defendant's

9   negligence directly and proximately caused plaintiff's mental and physical pain and

10  suffering.  FAC ¶ 97.  Of course, plaintiffs must plead factual allegations to support this

11  allegation.  They have done so because the FAC alleges that plaintiff suffered from the

12  same injuries (e.g., pelvic pain, dyspareunia, and erosion of the product) as those injuries

13  identified in medical literature and associated with the potential defects in pelvic mesh

14  products.  Id. ¶¶ 38, 47, 49, 68.  This is sufficient to allege causation.[4]

15        In sum, plaintiffs have plausibly stated a claim that Boston Scientific negligently

16  failed to warn plaintiff's physicians.

17          **ii.**    **Manufacturing Defect**

18        Defendant avers that plaintiffs have not identified a manufacturing defect in the

19  implanted Obtryx Sling that caused plaintiff's alleged injuries.  Mtn. at 6.  Similar to their

20  strict liability manufacturing defect argument, plaintiffs contend that they have alleged

21  how the Obtryx Sling deviated from Boston Scientific's intended result.  Opp. at 12–13.

22        The court's reasoning and conclusion with regard to plaintiffs' strict liability

23  manufacturing claim apply with equal weight here.  See Marroquin v. Pfizer, Inc., 367 F.

24  Supp. 3d 1152, 1164 (E.D. Cal. 2019) (finding strict liability manufacturing defect analysis

25

26  [4] In the FAC, plaintiffs allege that defendant failed to conduct post-marketing vigilance or surveillance of its products by monitoring or investigating various reports of issues with

27  the products.  FAC ¶ 96.  Because plaintiffs have sufficiently stated a claim for a negligent failure to warn based on a lack of disclosures made to Tami Hannan's

28  implanting physician, the court need not reach the issue of whether defendant has a post-marketing duty to warn.

1  applies equally to negligence manufacturing defect analysis).  Plaintiffs have not alleged

2  that the specific Obtryx Sling inserted in Tami Hannan was negligently manufactured.

3  Instead, they are arguing that all Obtryx Slings deviate from defendant's intended result.

4  This is a design defect argument and plaintiffs have not alleged sufficient facts that the

5  Obtryx Sling inserted in plaintiff was negligently manufactured.  Therefore, plaintiffs fail to

6  state a claim for negligent manufacturing defect.

7                        **iii.    Design Defect**

8         With regard to plaintiffs' design defect claim, defendant contends that plaintiffs

9  have failed to identify what aspect of the design of the Obtryx Sling, as opposed to the

10  Pelvic Mesh Products in general, is defective.  Mtn. at 7.  According to defendant,

11  plaintiffs never assert that a specific design defect in the Obtryx Sling caused plaintiff to

12  suffer a specific injury.  Id.  Plaintiffs respond that the FAC lists numerous flaws with the

13  Obtryx device and its component parts about which defendant either knew or should

14  have known.  Opp. at 13.  They further argue that they alleged medical literature

15  identified injuries caused by the products' defects and that plaintiff suffered from these

16  same injuries.  Id.

17         Generally, "the test of negligent design involves a balancing of the likelihood of

18  harm to be expected from a [product] with a given design and the gravity of harm if it

19  happens against the burden of the precaution which would be effective to avoid the

20  harm."  Merrill, 26 Cal. 4th at 479.  "Even if a manufacturer has done all it reasonably

21  could have done to warn about a risk or hazard related to a product's design, a

22  reasonable person could conclude that the magnitude of the reasonably foreseeable

23  harm as designed outweighed the utility of the product as designed."  Tucker v. Wright

24  Med. Tech., Inc., No. 11-CV-03086-YGR, 2013 WL 1149717, at *7 (N.D. Cal. Mar. 19,

25  2013) (citing Chavez v. Glock, Inc., 207 Cal. App. 4th 1283, 1305 (Ct. App. 2012)).

26         Here, plaintiffs allege a broad variety of potential defects with defendant's pelvic

27  mesh products.  For example, they allege that "[t]he use of polypropylene in the Products

28  and the adverse tissue reactions and host defense response that result from such

material, caus[e] adverse reactions and serious, permanent injuries including, but not limited to, painful recurrent erosions and associated intractable pain." FAC ¶ 37. As another example, plaintiffs allege that "[t]he propensity of the Products to become rigid and inflexible, caus[es] them to be improperly mated to the delicate and sensitive areas of the vagina and pelvis where they are implanted, and caus[es] discomfort and pain with normal daily activities that involve movement in the pelvic region (e.g., intercourse, defecation, walking). Id. Plaintiffs also allege that the Obtryx Sling is one of Boston Scientific's pelvic mesh products. Id. ¶¶ 7–8.

Plaintiffs' allegations are sufficient to state a claim for negligent design defect. They have identified several aspects of defendant's pelvic mesh products that are purportedly defective. Plaintiffs allege that the Obtryx Sling is one of those products, so it is reasonable to infer that the defects in the design of the pelvic mesh products apply to the Obtryx Sling.

For the foregoing reasons, defendant's motion to dismiss plaintiffs' third claim for negligence is GRANTED IN PART AND DENIED IN PART as discussed herein.

### 4.     Fourth Claim: Breach of Express Warranty

Plaintiffs' fourth claim is for breach of express warranty. They allege that Boston Scientific made assurances to the general public, hospitals, and health care professionals that the pelvic mesh products were safe and reasonably fit for their intended purpose. FAC ¶ 99. They claim that plaintiff, by and through her physician, reasonably relied on defendant's express warranty and defendant breached that warranty because the product implanted in plaintiff was unreasonably dangerous and defective. Id. ¶¶ 101–02.

An express warranty "is a contractual promise from the seller that the goods conform to the promise." Daugherty v. Am. Honda Motor Co., 144 Cal. App. 4th 824, 830 (Ct. App. 2006) (citing Cal. Com. Code § 2313). As a general rule, "privity of contract is a required element of a breach of express warranty cause of action." Tapia v. Davol, Inc., 116 F. Supp. 3d 1149, 1160 (S.D. Cal. 2015) (citing Burr v. Sherwin Williams Co., 42 Cal. 2d 682 695 (1954)). However, California courts recognize several exceptions to the

United States District Court
Northern District of California

privity requirement.  The exception relevant here applies where a "plaintiff's decision to purchase the product was made in reliance on the manufacturer's written representations in labels or advertising materials."  Fieldstone Co. v. Briggs Plumbing Prods., Inc., 54 Cal. App. 4th 360, 369 n.10 (Ct. App. 1997) (citations omitted), superseded by statute on other grounds as stated in Greystone Homes, Inc. v. Midtec, Inc., 168 Cal. App. 4th 1194 (Ct. App. 2008); Fundin v. Chi. Pneumatic Tool Co., 152 Cal. App. 3d 951, 957 (Ct. App. 1984).

"To prevail on a breach of express warranty claim, [p]laintiffs must prove: (1) 'the seller's statements constitute an affirmation of fact or promise or a description of the goods; (2) the statement was part of the basis of the bargain; and (3) the warranty was breached.'"  Brown v. Hain Celestial Grp., Inc., 913 F. Supp. 2d 881, 899–900 (N.D. Cal. 2012) (quoting Weinstat v. Dentsply Int'l, Inc., 180 Cal. App. 4th 1213, 1227 (Ct. App. 2010)).

The learned intermediary doctrine also applies to breach of warranty claims.  Carlin, 13 Cal. 4th at 1118 ("[O]rdinarily, it is the prescribing doctor who in reality stands in the shoes of the ordinary consumer.").  "[B]reach of express or implied warranty claims, like design defect claims, may not be maintained against a manufacturer of prescription drugs who has properly prepared the product and marketed it with warnings of known or knowable dangers."  Hufft, 4 Cal. App. 4th at 24 (citing Brown, 44 Cal. 3d at 1072).

Defendant argues that plaintiffs cannot state a claim for breach of express warranty because the learned intermediary doctrine applies to warranty claims and plaintiffs cannot maintain a claim for breach of express warranty.  Mtn. at 10.  Further, plaintiffs have not identified the terms of the warranty, that plaintiff relied on those terms, and the breach proximately caused her injury.  Id.  Plaintiffs respond that both plaintiff and her physicians relied on defendant's warranties.  Opp. at 15.  They further contend that the FAC contains descriptions of those warranties.  Id.

The court agrees with defendant that the learned intermediary doctrine applies to plaintiffs' breach of express warranty claim.  Therefore, plaintiffs must allege factual

1    allegations concerning the implanting physicians' reliance on the express warranties on

2    the label of the Obtryx Sling or the advertising associated with the Obtryx Sling.  They

3    have not done so.  The FAC states:

> Plaintiff, individually and/or by and through her physician, reasonably relied upon Defendant's express warranties and guarantees that the Products were safe, merchantable, and reasonably fit for their intended purposes, including but not limited to that the Product was a safe and effective means of treatment for Plaintiff's condition, was suitable for implantation into the human body, and would be a permanent, lifelong implant.

9    FAC ¶ 101.  The allegations do not describe the manufacturer's written representations

10   or how Boston Scientific made those representations to plaintiff's physician.  Nor do

11   plaintiffs allege how the implanting physician relied on those representations.

12       The allegations here are similar to two district court opinions that likewise found

13   insufficient to state a claim.  In Hammarlund v. C.R. Bard, Inc., No. 15-cv-05006-SVW-

14   JEM, 2015 WL 5826780, at *5 (C.D. Cal. Oct. 2, 2015), the plaintiff alleged that "Plaintiff,

15   individually and/or by and through his physician, reasonably relied upon Defendants'

16   express warranties and guarantees that the Ventralex patch was safe, merchantable, and

17   reasonably fit for its intended purpose."  The court reasoned that the plaintiff "must allege

18   facts demonstrating that Defendants' affirmations formed the basis of the bargain, i.e.,

19   facts regarding how the warranties were made to Plaintiff's physician, and that Plaintiff's

20   specific physician relied on them."  In Tapia, 116 F. Supp. 3d at 1162, the court

21   determined that the "complaint fails to allege that Plaintiff's prescribing physician read

22   and relied on the express warranties contained in the packaging and written

23   advertisements.  Plaintiff only alleges that the 'healthcare community' relied on the

24   express warranties in the packaging and written advertisements."  The reasoning in those

25   cases applies here.

26       For the foregoing reasons, defendant's motion to dismiss plaintiff's fourth claim for

27   breach of express warranty is GRANTED.

28   / / /

United States District Court
Northern District of California

United States District Court
Northern District of California

### 5.      Fifth Claim:  Negligent Misrepresentation

Plaintiffs' fifth claim is for negligent misrepresentation and they allege that defendant had a duty to accurately and truthfully represent to the medical and healthcare community, plaintiff, her physicians, and the public that the pelvic mesh products had not been adequately tested and found to be safe and effective for treatment.  FAC ¶ 106. They allege that defendant negligently misrepresented the pelvic mesh products' high risk of unreasonable, dangerous, and adverse side effects.  Id. ¶ 107.

Negligent misrepresentation requires "(1) the misrepresentation of a past or existing material fact, (2) without reasonable ground for believing it to be true, (3) with intent to induce another's reliance on the fact misrepresented, (4) justifiable reliance on the misrepresentation, and (5) resulting damage."  Apollo Capital Fund, LLC v. Roth Capital Partners, LLC, 158 Cal. App. 4th 226, 243 (Ct. App. 2007).  Negligent misrepresentation "sounds in fraud" and is subject to Rule 9(b)'s heightened pleading standard, though the claim does not require demonstrating an intent to deceive or defraud.  Errico v. Pac. Capital Bank, N.A., 753 F. Supp. 2d 1034, 1049 (N.D. Cal. 2010) (citing Oakland Raiders v. Oakland-Alameda Cty. Coliseum, Inc., 144 Cal. App. 4th 1175, 1184 (Ct. App. 2006)).

Defendant argues that plaintiffs' negligent misrepresentation claim fails to meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).  For example, the FAC fails to allege the "who, what, when where, and how" about the misrepresentation and omissions underlying plaintiff's misrepresentation claim.  Mtn. at 7–8.  Plaintiffs contend that defendant's alleged misrepresentations and omissions were part of an overall deceptive campaign regarding the Obtryx.  Opp. at 14.

Plaintiffs' allegations clearly do not meet the heightened pleading requirements of Rule 9(b).  "Rule 9(b) demands that the circumstances constituting the alleged fraud 'be specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong.'" Kearns, 567 F.3d at 1124 (alteration in original) (internal quotation marks omitted)

20

1   (quoting Bly–Magee v. California, 236 F.3d 1014, 1019 (9th Cir. 2001)).  There is no

2   specificity concerning defendant's alleged negligent misrepresentation.  Plaintiffs' own

3   argument demonstrates the lack of specificity; by citing an "overall deceptive campaign

4   concerning the Obtryx Sling," they fail to point to any specific event or circumstance that

5   was deceptive.  This claim fails Rule 9(b).

6        For the foregoing reasons, defendant's motion to dismiss plaintiffs' fifth claim for

7   negligent misrepresentation is GRANTED.

8        **6.      Sixth Claim:  Unfair Competition Law—Cal. Bus. & Prof. Code § 17200**

9        In their opposition brief, plaintiffs state that they have agreed to dismiss their sixth

10  claim for violation of California's Unfair Competition Law and any claim for attorneys'

11  fees.  Opp. at 2 n.1; Mtn at 1 n.1.  Therefore, plaintiffs' sixth claim for violation of

12  California Business & Professions Code § 17200 is DISMISSED WITH PREJUDICE.

13       **7.      Seventh Claim:  Loss of Consortium**

14       Plaintiffs' seventh claim is for loss of consortium.  They allege that plaintiff Daniel

15  Hannan has suffered and will continue to suffer loss of companionship of his spouse.

16  FAC ¶ 133.  Defendant argues that a loss of consortium claim, by its nature, depends on

17  the existence of a cause of action for tortious injury to the spouse and that, to the extent

18  plaintiffs fail to state a claim for their other causes of action, then the court should dismiss

19  the loss of consortium claim.  Mtn. at 11.  Plaintiffs concede that loss of consortium is

20  dependent on the tortious injury of one's spouse, it is not "parasitic" and belongs to the

21  spouse claiming the loss of consortium.  Opp. at 16.

22       Plaintiffs' loss of consortium claim is derivative of plaintiffs' other tort claims.  Hahn

23  v. Mirda, 147 Cal. App. 4th 740, 746 (Ct. App. 2007) (stating that loss of consortium claim

24  "stands or falls based on whether the spouse of the party alleging loss of consortium has

25  suffered an actionable tortious injury").  Because the court has found that some of

26  plaintiffs' causes of action for tortious injury are plausible, then the loss of consortium

27  claim also survives the motion to dismiss.

28       For the foregoing reasons, defendant's motion to dismiss plaintiffs' seventh claim

United States District Court
Northern District of California

21

for loss of consortium is DENIED.

## CONCLUSION

For the foregoing reasons, defendant's motion to dismiss plaintiffs' first cause of action for product liability—defective manufacture and design is GRANTED, and the strict liability design defect claim is DISMISSED WITH PREJUDICE and the strict liability manufacturing defect claim is DISMISSED WITH LEAVE TO AMEND; defendant's motion to dismiss plaintiff's second cause of action for product liability—failure to warn is DENIED; defendant's motion to dismiss plaintiffs' third cause of action for negligence is GRANTED IN PART AND DENIED IN PART, and the negligence manufacturing claim is DISMISSED WITH LEAVE TO AMEND; defendant's motion to dismiss plaintiffs' fourth cause of action for breach of express warranty is GRANTED, and the claim is DISMISSED WITH LEAVE TO AMEND; defendant's motion to dismiss plaintiffs' fifth cause of action for negligent misrepresentation is GRANTED, and the claim is DISMISSED WITH LEAVE TO AMEND; plaintiffs' sixth claim is DISMISSED WITH PREJUDICE; and defendant's motion to dismiss plaintiffs' seventh cause of action for loss of consortium is DENIED.  Plaintiffs shall file any amended complaint within 21 days of the date of this order.  Any amended complaint should allege each remaining product liability claim separately (e.g. strict liability manufacturing defect, strict liability failure to warn, negligent design defect, negligent manufacturing defect, and negligent failure to warn) for ease of reference.  No new parties or causes of action may be pleaded without leave of court or the agreement of defendant.

**IT IS SO ORDERED.**

Dated: May 5, 2020

/s/ Phyllis J. Hamilton
PHYLLIS J. HAMILTON
United States District Judge

United States District Court
Northern District of California

22